## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

| | |
|---|---|
| **KAREN MARSHALL, PAUL FLANNERY** | : |
| **And DARRELL R. WHITE, on behalf of** | : |
| **themselves and all others similarly situated,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : |
| | : |
| **HYUNDAI MOTOR AMERICA,** | : |
| | : |
| **Defendant.** | : **(REDACTED)** |

-------------------------------------------------------------------------x
-------------------------------------------------------------------------x

| | |
|---|---|
| **STEVE MILLER, RICHARD KOTELLY,** | : |
| **KATHLEEN RIORDAN, CHARLENE LIDDLE,** | : |
| **KRISTA PIERSKALLA and REBECCA** | : |
| **MCCORMICK, on behalf of themselves and** | : |
| **all others similarly situated** | : |
| | : |
| **Plaintiffs,** | : **Case No. 15-CV-04722 (CM),** |
| | : **12-CV-03072 (CM)** |
| **v.** | : |
| | : |
| **HYUNDAI MOTOR AMERICA,** | : |
| | : |
| **Defendant.** | : |

-------------------------------------------------------------------------x

## PLAINTIFFS' OPPOSITION TO DEFENDANT HYUNDAI MOTOR AMERICA'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVE MCLELLAN

KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570

*[Additional Counsel on Signature Page]*

***Attorneys for Plaintiffs***

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ……………………………………………………………………..1

INTRODUCTION……………………………………………………………………………………1

MR. McLELLAN'S EXPERT REPORT……………………………………………………………......2

i.    The Finding That The Class Vehicles Suffer From a Brake Defect ……………………..4

ii.   The Finding That The Brakes in Class Vehicles Prematurely Corrode Because
      Hyundai Manufactured The Brake Components From Materials That Could Not
      Adequately Resist Corrosive Conditions ………………………………………………...6

STANDARD OF REVIEW …………………………………………………………………………...10

ARGUMENT ………………………………………………………………………………………….11

I.    Mr. McLellan's Testimony is Reliable Because He Relies Upon Sufficient Technical
      Evidence, Typically Relied Upon By Engineers, Reasonably Applied to This Case …..11

      A. Mr. McLellan Relies Upon Sufficient Technical Evidence ……………………….……11

         i.    Mr. McLellan's Reliance on Facts and Data Produced by Hyundai, HATCI, and
               Mr. Sullivan Renders His Testimony More Reliable ……………………….……..17

         ii.   Mr. McLellan Relies on Sufficient Facts and Data to Prove Plaintiff's Claim
               For Breach of Warranty …………………………………………………….……...20

II.   Mr. McLellan Reasonably Applies the Evidence and Scientific Principles or Methods
      to The Facts of This Case……………………………………………………………….……21

      A. Defendant Focuses its Opposition to Mr. McLellan on Inquiries Wholly Irrelevant to
         the Relevance of Mr. McLellan's Expert Testimony …………………………….……..22

      B. Mr. McLellan Reasonably Applies the Evidence to The Facts to Identify The Materials
         as The Cause of Premature Corrosion in Class Vehicles ……………………….……...24

      C. Mr. McLellan's Theory Specifically Addresses the Material Issues of Plaintiffs'
         Claims………………………………………………………………………………….……...26

III.  Mr. McLellan's Opinions Are Well Within His Area of Expertise ……………..……….28

CONCLUSION ………………………………………………………………………………….……..29

## TABLE OF AUTHORITIES

CASES

*accord Franz v. New Eng. Disposal Techs.*, Inc.
Case No. 10-201, 2016 U.S. Dist. LEXIS 78734 (W.D.N.Y. June 16, 2016)...........................25

*Asad v. Cont'l Airlines, Inc.*
314 F. Supp. 2d 726 (N.D. Ohio 2004).....................................................................17

*Barris v. Bob's Drag Chutes & Safety Equipment, Inc.*
685 F.2d 94 n.10 (3rd Cir. 1982)...........................................................................17

*Boucher v. U.S. Suzuki Motor Corp.*
73 F.3d 18 (2d Cir. 1996)....................................................................................20

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*
769 F. Supp. 2d 269 (S.D.N.Y. 2011)......................................................................11

*Cruz v. Kumho Tire Co., Inc*.
2015 WL 2193796 (N.D.N.Y. May 11, 2015)............................................................17

*Daubert v. Merrell Dow Pharm.*
43 F.3d 1311 (9th Cir. 1995)................................................................................26

*Don's Hydraulics, Inc. v. Colony Ins. Co.*
417 F. Supp. 2d 601 (D. Del. 2006)........................................................................17

*Engler v. MTD Prods.*
No. 13-575, 2015 U.S. Dist. LEXIS 25138 (N.D.N.Y. Mar. 2, 2015).................................16

*Figueroa v. Bos. Sci. Corp.*
254 F. Supp. 2d 361 (S.D.N.Y. 2003)......................................................................25

*Gen. Elec. Co. v. Joiner*
522 U.S. 136 (1997)..........................................................................................18

*Great N. Ins. Co. v. Power Cooling, Inc.*
Case No. 06-CV-874, 2007 U.S. Dist. LEXIS 95912 (E.D.N.Y. Dec. 18, 2007).....................20

*Gussack Realty Co. v. Xerox Corp.*
224 F.3d 85 (2d Cir. 2000)..................................................................................17

*Inland Fastener, Inc. v. S. Holland Metal Finishing Co.*
2015 IL App (2d) 140947-U, ¶ 30...........................................................................16

ii

*Lappe v. Am. Honda Motor Co., Inc.*
857 F.Supp. 222 (N.D.N.Y.1994)……………………………………………………………………..17

*Little v Kia Motors Am., Inc.*
455 N.J. Super 411 190 A.3d 502 (App. Div. 2018)…………..…………………………………..19

*Marvel Characters, Inc. v. Kirby*
726 F.3d 119 (2d Cir. 2013) …………………………………………..…………………………..19

*Merryman v. Citigroup, Inc.*
15–cv-9185 (CM),2018 WL 1621495 at *19-20 (S.D.N.Y. Mar. 22, 2018)………………………..11

*Samuel-Bassett v Kia Motors Am., Inc.*
613 Pa. 371 A.3d 1 (2011)………………………………………………………………………..19

*Santoro ex rel. Santoro v. Donnelly*
340 F. Supp. 2d 464 (S.D.N.Y. 2004)…………………………………………………………....18

*Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.*
Case No. 08-06304, 2012 U.S. Dist. LEXIS 60386 (D.N.J. Apr. 30, 2012)………………….…..16

*Wills v. Amerada Hess Corp.*
79 F. 3d 32 (2d Civ. 2004)…………………………………………………………….…………..23

*Wolin v. Jaguar Land Rover N.A., LLC*
617 F.3d 1168, 1173 (9th Cir. 2010) …………………………………………………….………..9

*Zornberg v. CBH Props., Inc*
967 N.Y.S.2d 742 (2d Dep't 2013)……....……….………………………………….…………..20

## PRELIMINARY STATEMENT

Plaintiffs submit this opposition to Defendant Hyundai Motor America's ("HMA" or "Defendant") Motion to Exclude the Expert Testimony of Dave McLellan. For the reasons discussed herein, Defendant's Motion to Exclude Mr. McLellan should be denied.

## INTRODUCTION

Mr. McLellan's testimony is offered in support of class certification to demonstrate there are common issues with regard to the breach of warranty and deceptive trade practices claims. In the merits context, his testimony would help the jury determine HMA's liability for those claims. Mr. McLellan's work involved relevant analysis which Defendant's own experts failed to engage in: That is, as a trained, senior automotive engineer with many years of top level experience, he travelled to salt-belt states to inspect exemplar Class Vehicles with failed brakes due to corrosion and inspected those vehicles prior to repairs being made[1]. He photographed the parts, inspected them and, in some cases, took the parts to be tested and analyzed in the laboratory, including a seized brake caliper obtained and examined by Eric Sullivan ("Mr. Sullivan"), a forensic engineer with Intertek Industry Services ("Intertek") and analyzed the in the Intertek Industry Services Preliminary Evaluation Report of August 2018 ("Intertek Report" Exh. 25 to Class Cert Motion[2]). The results of this testing and analysis was also supported by HMA's own engineers in the various

---

[1] The brake parts which are the subject of this action are those which are not excluded from the 5 yr/60,000 mile new vehicle basic warranty (the "Warranty") or listed as being subject to the more limited 12,000 mile/12 month warranty. The brakes covered by the basic Warranty include the brake calipers, rotors, spring clips and brake pad carrier.

[2] As certain Exhibits were already submitted on Plaintiff's Motion for Class Certification as Attachments to the Declaration of Gary S. Graifman in support of Motion for Class Certification (Dkt. No. 85), Plaintiff refers to these exhibits as "Exh ___ to Class Cert Motion." Exhibits submitted on Plaintiff's Reply in Support of Class Certification, which were annexed to the Reply Declaration of Gary S. Graifman (Dkt. No. 122), are referred to as "Exh. ___ to Reply Class Cert Motion." New exhibits submitted herewith are referenced to as "Exh. ___ to Graifman Expert Decl."

Quality Information Reports ("QIRs"), Field Service Engineering Reports ("FSEs") and the in-depth Hyundai–Kia American Tech. Center Report (the "HATCI Report") which also found a common problem existed in Hyundai's prematurely corroding brakes. None of Defendant's experts did anything remotely similar, as they testified they did not inspect or analyze any Sonata brakes which failed due to corrosion, and, therefore, could not opine on the cause or effects of the corrosion problem.  In essence, they chose to ignore the mountain of evidence produced in which HMA's own engineers found a defect present in the brakes of the Class Vehicles.

Despite HMA's quibble with various other types of analysis it incorrectly claimed he ought to have done, Mr. McLellan does not need to prove the existence of a design defect. He does not need to offer alternative designs or industry comparisons, calculate the number of vehicles HMA repaired, or opine on how long the brake parts should last ▮

▮ (See Exh. "18" to Class Cert

Motion).  Mr. McLellan's opinion is that the Sonata brakes on Class Vehicles had common materials and suffered from a uniform materials defect that HMA charged customers to repair. At this stage of the litigation, Mr. McLellan's Report is submitted to demonstrate that class certification is warranted. In addition, Mr. McLellan's Report[3] explains how the brake parts work and the function they serve (p. 3) and is therefore also helpful to provide information that a layperson might not otherwise know. Mr. McLellan has the requisite experience in automotive engineering, materials selection, customer relations, and product development, as well as the designing and production of automobile components to provide this opinion on the basis of reliable evidence. HMA's Motion to Exclude the Expert Testimony of Mr. McLellan should, therefore, be denied.

---

[3] The McLellan Report is annexed as Exh "1" to the Graifman Expert Decl.

2

## MR. MCLELLAN'S EXPERT REPORT

Mr. McLellan is a renowned automotive engineer who worked for General Motors for thirty-three years as the Assistant Staff Engineer for Camaro and Nova chassis systems, and then as Chief Engineer where he lead a team of world class engineers responsible for the redevelopment of the Corvette, including the entire chassis system, the brake system. Expert Report of Dave McLellan in Connection with Plaintiff's Motion for Class Certification, p. 1, Sept. 4, 2018 ("McLellan Report") (Exh. "1" to Graifman Expert Decl.) In that capacity, Mr. McLellan was responsible for the design, engineering, testing, and manufacturing of all aspects of the Corvette, including the design and testing of the brake components. *Id.* He holds a Master of Science in Management and a Bachelor of Science in Mechanical Engineering, each from Wayne State University.

In this case, Mr. McLellan personally evaluated three HMA Sonata brake systems, from Class Vehicles that failed due to corrosion. He worked with Plaintiffs' other engineering expert, Mr. Sullivan to analyze and test a corroded and seized exemplar brake caliper form a Class Vehicle. The testing of the caliper was relevant because HMA's customer database included

(samples of such complaints

at pp. 5-7 of McLellan Report). Mr. McLellan also evaluated documents produced by HMA in discovery, including HMA's reports on the brake problems experienced in Sonatas, photographs from the vehicle inspections of two class representatives (*e.g.*, Miller and McCormick), consumer complaints, and testing reports from Hyundai's brake component manufacturer, Mando, and HATCI. This extensive documentation and detailed analysis provide a substantial and reliable bases for Mr. McLellan's opinions that the Class Vehicles suffer from a common brake defect caused by the materials used to manufacture the brake parts. As noted above, unlike Defendant's

expert, Mr. McLellan looked at corroded and failed HMA brake parts that should have been covered by the Warranty.

### i. *The Finding That The Class Vehicles Suffer From a Brake Defect.*

Mr. McLellan personally inspected, photographed, measured, and tested corroded brake components in three Sonatas, as well as reviewed and evaluated HMA's extensive internal QIRs and FSEs; engineering evaluations and customer surveys produced by HATCI; and Mr. Sullivan's study; class members' complaints about corroded brakes; HMA's warranty payment databases; deposition transcripts of Hyundai's Korean engineers and testing of braking components in the Class Vehicles. On these bases, he concluded that the Class Vehicles suffer from a common brake failure that results in: (1) seizure of the brake caliper pistons due to corrosion that binds and freezes the pistons; (2) seizure of the brake pad slider clips and carrier due to corrosion; and (3) failure of the brake rotor disk due to corrosion on the disc surfaces. McLellan Report, p. 4.

Mr. McLellan's relied on his own observation and measurements taken with a Micrometer of the blocked clearance spaces between brake components in corroded brakes of the several Sonatas to support his conclusion that pistons in Class Vehicles were seizing due to corrosion. *See* McLellan Report, pp. 9-11.[4]

He also relied on his observations of seized slider clips and carriers in two Sonatas to support his opinion that the slider clips and carriers in Class Vehicles will seize and fail due to corrosion. McLellan Report, pp. 8-9. His opinion is also

. From the

February 2008, April 2008, May 2009, and January 2010 FSEs, Mr. McLellan reviewed

---

[4] He also bases his opinion on the Electron Dispersive Spectroscopy ("EDS") and static load testing performed on corroded pistons and bores as well as photographs taken through a stereo microscope of cross-section cuts of a corroded Sonata caliper by Mr. Sullivan. Intertek Report. (Exh. "25" to Class Cert Motion.)

[REDACTED]

[REDACTED] .[5] Mr. McLellan also evaluated HMA's [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Apr. 7, 2008 QIR, Exh.

"5," to Class Cert Motion at HMAM_002591 ("Apr. 2008 QIR"). Mr. McLellan further supported

his opinion with photographs from the HATCI Report that showed [REDACTED]

[REDACTED] HATCI Report, Exh. "4" to Class

Cert Motion at HMAH_001356 ("HATCI Report"). Furthermore, Mr. McLellan relied on customer

complaints [REDACTED]

[REDACTED] . *See*, Summary of CACC Complaints at pp. 5-7 of

McLellan Report and Exh. 19 to Class Cert Motion.

Mr. McLellan's opinion that the rotors in Class Vehicles fail due to corrosion buildup on the

rotor surfaces is based on his own observation of a disassembled 2010 Sonata brake system, which

revealed a heavily rusted brake rotor. McLellan Report, pp. 11-12. Mr. McLellan, further, relies on

a QIR released by HMA in September of 2007 [REDACTED]

[REDACTED]

[REDACTED]

---

[5] See, Feb. 19, 2008 FSE, Exh. "2" to Graifman Expert Decl., at HMAM_002576, ("Feb. 2008 FSE"); Apr. 28, 2008 FSE, Exhs. "21" & "22", to Class Cert Motion, at HMAM_002578, 002580 ("Apr. 2008 FSEs"); May 13, 2009 FSE, Exh. "23" to Class Cert Motion at HMAM_004866, ("May 2009 FSE"); Jan. 27, 2010 FSE, Exh. "3" to Graifman Expert Decl., at HMAM_002582, ("Jan. 2010 FSE").

Sept. 5, 2007 QIR, Exh. "20," to Class Cert Motion at HMAM_004875 ("Sept. 2007 QIR").

### ii. The Finding That The Brakes in Class Vehicles Prematurely Corrode Because Hyundai Manufactured The Brake Components From Materials That Could Not Adequately Resist Corrosive Conditions.

After identifying widespread failures in the common corroded brake components, Mr. McLellan concluded that the caliper seizure was due to a premature corrosion: "the primary source of failure was the outer seal allowing salt water from the road in winter to get into the air space between the outer and inner seals[, which]... resulted from a materials issue since such parts should not corrode to a point of binding or freezing during the warranty." McLellan Report, p. 9. Mr. McLellan supports his opinion by, first, identifying the materials Hyundai used to manufacture the brake components based on the deposition testimony of Hyundai's own brake design engineers, Kisoo Lee and Gwang-Yun Kim. Deposition of Kisoo Lee, 24:18 – 29:6, Oct. 15, 2015, Exh. "4" to Graifman Expert Decl. ("Lee Dep."); Deposition of Gwang-Yun Kim, 75:13-20, Oct. 14, 2015 ("Kim Dep.") (Exh. "5" to Graifman Expert Decl.) and EDS testing performed on the piston and bore. Intertek Report, pp. 19-20. He identifies the materials makeup of the components as follows: caliper housing (cast iron), caliper carrier (cast iron with zinc plating), pad slider clips (stainless steel), pad backing plate (painted steel with phosphate pretreatment), rotors (cast iron), and brake pistons (steel with chrome plating on the outside surface). McLellan Report, p. 2, 11.

Mr. McLellan, next, discusses the HATCI evaluation which observed that

McLellan Report, p. 4, 11-

12.[6] His own observations and photographs showed heavy corrosion which froze the brake carrier

---

[6] HATCI Engineering Evaluation – NF Brake Pad Sticking Problem, Feb. 1, 2006, HATCI_000005 ("Feb 1 HATCI Pad Sticking Evaluation"), annexed as Exh. "6" to Graifman Expert Decl.

in place on a 2010 Sonata Class Vehicle. McLellan Report, p. 11. Mr. McLellan also found that the brake pad adhered to the rotors from photographs of the 2010 Sonata he inspected, where the brake pad could not disengage with the disc, McLellan Report, p. 11. From photographs of Mr. Sullivan's inspection of a 2009 Sonata, where the brake pads would not easily disengage from the rotor because the carrier and springs were frozen, *id.*, at p. 12. Mr. McLellan's opinion that the brake pads were seized into the rotors at high heat is supported by

The 2010 Sonata inspected by Mr. McLellan also contained heavily corroded rotors, supporting his conclusion that the wet, adhesive brake pads cause corrosion of the rotors.

Mr. McLellan also concluded that water infiltrates into the brake caliper system through the rubber seal on the caliper piston, corrodes the materials used to manufacture brake caliper pistons and bore, and seizes the piston. McLellan Report, p. 12. Mr. McLellan relies on his own observation and photographs of a 2010 Sonata, *id.*, at p. 10-11, and Mr. Sullivan's photographs and analysis of the cross-section cutting of the exemplar seized caliper to support his conclusion that the water infiltrates the rubber seal on the piston. Intertek Report, p. 11-14. Mr. McLellan further relies on his own observation and photographs of 2009 and 2010 Sonata brake components, McLellan Report, pp. 10-12 along with the Intertek photographs of cross-cutting and EDS analysis of the rust on the pistons and bores to support his opinion that the water corrodes the material used to manufacture the pistons and bores in Class Vehicles. Intertek Report, p. 21, "Findings and Conclusions." Last, Mr. McLellan's determination that the corrosion of the caliper piston's bore and inside of the piston causes the piston to seize in the bore, is supported by his own Micrometer measurements of the diameter of and clearance space between the piston and bores he took from a corroded 2008 Sonata, McLellan Report, pp. 8-9, his observation of mechanics having to use hammers to free the pistons

from the bores of corroded 2008 and 2010 Sonatas, *id*., pp. 8-10, and static load testing performed on the corroded piston of a 2009 Sonata. Intertek Report, p. 8.

Mr. McLellan found that the corrosion of the Class Vehicle components "resulted from a materials issue since such parts should not corrode to a point of binding or freezing during the warranty." McLellan Report, p. 9. Mr. McLellan also relies on the testimony of Hyundai's engineer, Kisoo Lee, to

Mr. McLellan's testimony should be permitted in support of class certification because it is both reliable and relevant. Mr. McLellan's testimony is reliable because it is based on sufficient facts and data generated by his own observations and measurements of several corroded Sonata brake components, as well as HMA's own documents analyzing the brake defect and testing of and reports on corroded Sonatas by Mr. Sullivan, HMA, and HATCI. HMA claims Mr. McLellan did not perform tests and research, speak with drivers, drive the car himself or calculate the failure rate to support that the defect affects all Class Vehicles. But Mr. McLellan observed and measured the Sonata brake components himself and consulted with Mr. Sullivan to agree on the EDS and static load testing performed on corroded Sonata components. [7] Furthermore, HMA's belief that Mr. McLellan did not analyze failure rates or other statistics to support his conclusion that all Class Vehicles contain a materials defect also fails, since those are the types of challenges which go to the weight of his testimony, and not its reliability and, in any event the failure rate of the brake defect is a merits issue, not for class certification determination. *Wolin v. Jaguar Land Rover N.A., LLC,* 617 F.3d 1168, 1173 (9th Cir. 2010).

---

[7] In contrast, James Walker, the expert proferred by HMA never examined or tested any corroded brake parts for a Sonata or Sante Fe vehicle. (Walker *Haag* Dep., p. 43:13-44:20 Exh. "7" to Graifman Expert Decl.)

Ironically, HMA's own argument supports a high failure rate. It claims to have done

(which does not even capture additional repairs in which warranty coverage was refused by HMA or which were done at independent repair shops). That warranty number alone would equal approximately In the world of automotive defects, a failure rate that high would be flagged as a major issue (which it was, given the number of QIRs and HATCI investigations done to analyze the issue). See, "TOTAL RECALL: Despite Quality Improvements, Costly Safety Issues Continue to Dog Automakers", *Automotive News*, Oct. 28, 2013 at p. 3 (noting that one major automobile manufacturer "sets a tolerance of 0.05 percent or 1 in 2000 vehicles; any defect with a higher incidence rate goes up the chain of command for a closer review." Exh. "8" to Graifman Expert Decl.)

Finally, HMA maintains that Mr. McLellan does not compare the failure rate of Class Vehicles with other vehicles or propose alternative designs based on comparisons with other vehicles. But Mr. McLellan does not need to perform those calculations to provide opinions on the crucial fact at issue – whether the materials used to manufacture the brake components of Class Vehicles prematurely fail in corrosive conditions. The evidence on which Mr. McLellan relies is reliable because it is the product of reliable principles and methods of evaluation that Mr. McLellan himself employs in his experience as an engineer.

While Defendant claims he should have compared the Hyundai Sonata brakes to "competitive" manufacturers' brakes, such analysis is irrelevant to the issues at hand for two reasons. First, it was unknown by HMA's expert, James Walker, what any of those other manufacturers' failure rates were by comparison to HMA. Walker acknowledged those competitive vehicle brakes had different designs, different packaging and different exposures and could, therefore, not assist Walker in answering the question as to why HMA's brakes corrode prematurely

9

and frequently (Walker *Miller* Dep., pp. 22:17-23:5, annexed to Graifman Expert Decl. at Exh. "9").[8] Second, Walker did not know whether those other manufacturers covered brake corrosion for parts when they were not excluded from the basic warranty and occurred during the warranty. That would be directly relevant to such comparison and without it, such comparison is not relevant. For example, Walker himself testified that his prior employer, Ford, did cover brake corrosion repairs during the basic warranty. Walker *Haag* Dep., p. 182, Graifman Expert Decl., Exh. "7"

Neither party disputes that the evidence on which Mr. McLellan relies is a product of reliable principles and methods of evaluation. Instead, HMA disputes whether Mr. McLellan reasonably applied the evidence to this case. But Mr. McLellan makes no unfounded conclusions in his report. Rather, he applies his own knowledge, observations and measurements of the corroded Sonata components to evaluate the testing and photographs of the defect of the brake components in Sonatas and comes to the well-supported conclusion that Class Vehicles suffer from premature corrosion due to a common materials defect.

## **STANDARD OF REVIEW**

The applicable standard of review is set forth in the Plaintiffs' Memorandum in Opposition To Defendant Hyundai Motor America's Motion to Exclude the Expert Testimony of Dr. Richard Lynch which is incorporated herein by reference.

---

[8] As Defendant's Brief notes (p. 3, n.1), the parties agreed to use the expert depositions taken in the *Haag* case here. The parties conducted further depositions in this case with regard to any new or different material. Therefore, references to the Haag depositions are preceded with the word "*Haag*." Depositions in this case, are preceded with the word "*Miller*".

Briefly, however, with regard to the fact the expert report is only submitted in support of class certification at this juncture, the *Daubert* inquiry is appropriately limited as "courts in this Circuit have applied its standard but found that the ***scope of the Daubert analysis is cabined by its purposes at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirement of Rule 23.***" *Royal Park Investments SA/NV v Deutsche Bank Natl. Tr. Co.*, 14-cv-4394 (AJN), 2018 WL 1750595, at \*7 (S.D.N.Y. Apr. 11, 2018) (internal citations removed, emphasis added); *see also In re Visa Check/Mastercard Antitrust Litig.,* 192 F.R.D. 68, 77-78 (E.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001) (finding plaintiff's testimony admissible at class certification because "[t]he admissibility inquiry under *Daubert* and *Kumho Tire* must be adapted to the facts … and to the stage of the proceedings."); *In re Zurn Pex Plumbing Products Lia. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage …."). *See also, Merryman v. Citigroup, Inc.*, 15–cv-9185 (CM), 2018 WL 1621495 at \*19-20 (S.D.N.Y. Mar. 22, 2018).

## ARGUMENT

### I. Mr. McLellan's Testimony is Reliable Because He Relies Upon Sufficient Technical Evidence, Typically Relied Upon By Engineers, Reasonably Applied to This Case.

#### a. Mr. McLellan Relies Upon Sufficient Technical Evidence.

Mr. McLellan's testimony is reliable because it is based on sufficient facts and data established using reliable principles and methods of evaluation. In the context of engineering testimony, experts "may rest on scientific foundations or on the personal knowledge or experience of the engineer," and "extrapolate[ions] from existing data." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011). So long as the expert testimony is based upon "good grounds… it should be tested by the adversary process-competing expert

testimony and active cross-examination-rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d, at 173.

As detailed above, Mr. McLellan based his analysis on sufficient facts and data. Experts rely on sufficient facts and data to the extent that they arrive at conclusions based on their "own review of documents and the results of testing[,]" and not "only on what the plaintiffs told them." *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d, at 285. Even where the expert relies on testing "conducted by independent consultants[,]" rather than the expert himself, the facts and data can provide sufficient evidence for the expert's individual analysis. *Id.*, at 285. Nonetheless, Mr. McLellan's own observations and measurements of corroded Sonata brake components, along with his analysis of the evidence compiled by several independent sources – namely, Mr. Sullivan, HATCI, and even HMA – provides a sufficient basis for his conclusions.

Mr. McLellan relied on photographs taken by HMA, HATCI, and Mr. Sullivan of corroded brake components, records of warranty claims for corroded parts submitted to HMA, customer complaints, and EDS testing performed on the corroded seized brake components by Mr. Sullivan, all of which established that the corrosion progressed to the point that the brake rotors, pads, slider clips, and pistons seized in place. *See discussion supra.* But Mr. McLellan did not accept these conclusions on face value; he observed and took photographs of the corroded parts and measured of the diameters and clearance between corroded Sonata brake components to explain how the corrosive elements interact with the pistons and bores to cause them to prematurely corrode.

Mr. McLellan personally inspected three brake systems removed from Sonatas and confirmed the seizure of the components due to corrosion from water that infiltrated the components of the brake system. The first Class Vehicle was a 2008 Sonata from New Jersey that

had the brake pads replaced three times due to corrosion since the owner first began to experience problems at 48,000 miles. After mounting the car on a hoist, removing the wheels, and unbolting the caliper assembly, Mr. McLellan observed that the brake "pads were frozen in the frame. The mechanic needed to use a hammer to break the pads free from the frame as they were frozen in place because of a buildup of corrosion." McLellan Report, p. 8. When he tried to move the piston, he found it was frozen in place. *Id.*, at p. 8. The mechanic could not move the piston out of its cylinder or in a manner that it typically moves inside the brake system using his pliers until he hammered the pliers and applied WD-40. *Id.*, at pp. 8. The second vehicle that Mr. McLellan inspected was a 2010 Sonata from Ohio with 39,818 miles on it. *Id.*, p. 9. Just like the Class Vehicles studied in the HATCI Report, "Disassembly of the left rear brake showed that corrosion had frozen the brake pads to the frame and the pads were backed off from engaging the disc." *Id.* Additionally, as was the case with the first vehicle he examined, Mr. McLellan observed that the piston was frozen into the cylinder. *Id.* To free the piston, Mr. McLellan mounted the caliper in a vice, inserted a steel rod through the hole in the back of the cylinder, and hammered the rod several times. *Id.*

When he examined the rear brakes on a car hoist, he observed that the left rear rotor was heavily rusted from brake pad contact. McLellan Report, p. 9. He took photos of the various brake components and noted the lack of polish and level of rust on the left rotor, right disc brake, and the left inboard and outboard brake pads. *Id.* He again observed rust that extended under the outer boot seal as well as on the surface of the caliper. *Id.* Mr. McLellan specifically took a picture of the left brake outer boot seal and noted the corrosion has progressed under all but the inner bubble of the seal; thick flakes of corrosion on the side of the bubble were particularly noteworthy. *Id.*, p. 11. Mr. McLellan knew, because "[i]ron corrosion, commonly called rust, is chemically a hydrate of

Fe203[,] it has a volume about twice (x2) that of uncorroded metal." *Id*., p. 9. He, therefore, confirmed that the corrosion was the cause, and not simply a symptom, of the seized components when he measured the piston and bore diameters using a micrometer and took pictures of the results using a macro-lens camera. *Id*., at p. 10. He found that the clearance between the piston and the bore was normal at .002 inches, but "in the area where it was heavily corroded that clearance appeared to have been lost." p. 8.

Mr. McLellan then linked how moisture reached the brake components in the first place. He noticed the corrosion when he removed the outer boot seal on the piston to analyze the part; when he removed the seal, he saw iron rust on the inside of the seal and on the seal retaining surface of the caliper. *Id*., at pp. 9-10. Mr. McLellan worked with Mr. Sullivan to saw off the opposite side of the fluid/air seal and clamp the portion of the caliper to take a picture of where the corrosion developed in the seal. The corrosion in that area led Mr. McLellan to opine that the outer seal allowed salt water to get into the brake component system between the inner and outer seals. *Id.*, at 12. The pathway of the corrosion combined with his knowledge of how corrosion expands the size of metals led Mr. McLellan to conclude that the corrosion "on the bore surface outboard of the brake fluid/air seal filled the small, designed, air gap and was dragging on the piston making it bind." p. 9.

Having observed frozen pistons in his first two samples, and after concluding the method of intrusion through the seal ring and distribution of corrosion through the bore and then the piston, Mr. McLellan sent the third specimen – a corroded caliper from a 2009 Sonata – to the forensic engineering firm on Plaintiffs' team, Intertek, to test his theory. Mr. Sullivan of Intertek took detailed pictures of the components and looked at the part under a stereo microscope, which showed that corrosion products "filled the annular gap between the piston and bore" and advanced to the

14

point where flakes of corrosion scale were exfoliating from the inside surface of the piston. Intertek Report, p. 8. Mr. Sullivan then measured the static load used to remove the seized piston and concluded that the piston remained frozen after a fifty pound load rested on the back side of the piston for "several minutes." *Id.*

Mr. McLellan and Mr. Sullivan decided to remove and/or stabilize all external corrosion on the caliper and slice the caliper and piston in half to see the components inside without displacing them. *Id.* As detailed in the Intertek Report, Mr. Sullivan sealed "the piston bore interface… in epoxy so that corrosion products or other deposits would be retained" and made cross-section cuts through the caliper and piston, which allowed him to remove the caliper body and examine the area where the piston and bore interfaced. Intertek Report, pp. 8-9. Photographs of the cross-section cutting confirm Mr. McLellan's observations that the water infiltrated the inner seal and caused severe corrosion. "[C]orrosion deposits within the piston bore were primarily limited to the region between the piston seal O-ring and the location of the piston dust boot." *Id.*, p. 9. Mr. Sullivan's EDS testing detected "high concentrations of iron (Fe) and oxygen (O), consistent with rust formation on steel or iron." *Id.*, at p. 19. Mr. Sullivan's observations and testing found that the piston was seized within the bore due to a solid layer of corrosion that had built up between the piston and bore; "The corrosion responsible for seizing of the piston was limited to the small region between the piston seal and the dust boot." *Id.*, p. 21. After observing the other two exemplars, viewing the photographs, including ones from Intertek's stereo microscope, and reading the test results of the EDS, Mr. McLellan confirmed his explanation of how a defect in the boot seal allows water to reach the brake components in Class Vehicles. McLellan Report, pp. 12-14.

This analysis was not an isolated one because Mr. McLellan reviewed warranty claim and mileage information from the Class Vehicles that underlie HMA's various FSEs, the September

15

QIR analysis and the HATCI Report, all of which came to the

McLellan Report, p. 4-8, 15. Thus, McLellan applied his expertise in engineering and brake design, supported by the testimony of HMA's experts as to the expected lifespan of the brake components (Lee Dep., 42:8-17 Graifman Expert Decl. Exh. "4"), to opine with a reasonable degree of automotive engineering certainty that the parts in Class Vehicles suffer from a materials defect because they corrode to the point of failure before the end of the Basic Warranty period. McLellan Report, p. 10.

Last, the facts and data upon which Mr. McLellan relies are products of reliable principles and methods that engineers and individuals with a background in metallurgy typically employ. A salt spray corrosion test, like the one conducted by HATCI, for example, represents a typical test performed on metals to determine whether they can sufficiently resist corrosion. *See Inland Fastener, Inc. v. S. Holland Metal Finishing Co.*, 2015 IL App (2d) 140947-U, ¶ 30. Moreover, the Electron Dispersive Spectroscopy that Mr. Sullivan used to analyze Sonata exemplar brake caliber components in his report have been used by engineers and metallurgists to test products. *Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.*, Case No. 08-06304, 2012 U.S. Dist. LEXIS 60386, at *103 (D.N.J. Apr. 30, 2012) (finding EDS to be a "well-known, widely accepted analytical test methodology"); *accord* Lynch Report, p. 2. The pictures taken by HATCI and HMA also provide reliable evidence of corrosion. *Engler v. MTD Prods.*, No. 13-575, 2015 U.S. Dist. LEXIS 25138, at *34 (N.D.N.Y. Mar. 2, 2015) (finding that Plaintiff's expert could opine on the cause of a brake failure, in part, based on pictures). Ultimately, neither party disputes that the evidence on which Dr. Lynch relies is a product of reliable principles and methods of evaluation. Instead, HMA disputes whether Mr. McLellan relies on sufficient facts and data to support his conclusions.

### *i. Mr. McLellan's Reliance on Facts and Data Produced by Hyundai, HATCI, and Mr. Sullivan Renders His Testimony More Reliable.*

HMA first argues that Mr. McLellan's opinion as to the materials defect in Class Vehicles is not based on sufficient facts or data because he did not collect all of the data himself. *See* Defts. Br., p. 15. Rule 703 of the Federal Rules of Evidence, however, does not require Mr. McLellan to rely on his own testing in formulating his opinion. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

The fact that an expert did not personally collect the data or observe the tests, does not affect the relevance or reliability of the testimony. *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000); *see also Don's Hydraulics, Inc. v. Colony Ins. Co.*, 417 F. Supp. 2d 601, 610 (D. Del. 2006). Courts have read Rule 703 to mean that experts may rely on "facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions." *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004) (citing *Barris v. Bob's Drag Chutes & Safety Equipment, Inc.*, 685 F.2d 94, 102 n.10 (3rd Cir. 1982)). *Cruz v. Kumho Tire Co., Inc.*, 2015 WL 2193796 at \*10 (N.D.N.Y. May 11, 2015) ("[A]lthough 'defendant points out that Dr. Paul can offer no tests, and no protoypes or drawings of satisfactory machinery,' in the court's view, 'these are precisely the kinds of matters that should be left for the jury to consider in assessing the weight to be given to Dr. Paul's testimony.'" (internal citations omitted); *See Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 228 (N.D.N.Y.1994) (expert's opinions may be properly grounded in the results of his investigation, observations, experience, calculations, examination of accident reports, legal documents, medical records, medical images, owner's manuals, comparable Honda Civics, an inspection of the accident site, accident vehicle, transcripts

17

of witness depositions, reports from defendants' liability experts, numerous photos of the accident scene, and police and medical reports).

Trained experts in engineering, like Mr. McLellan, "commonly extrapolate from existing data" compiled by others and incorporate the data into testimony based on "scientific foundations" and their own "personal knowledge or experience." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011) (citing *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data."). Here, Mr. McLellan learned what materials HMA used to manufacture the brake components in Class Vehicles, observed corroded vehicles that contained virtually identical brake components, and actually developed a test of brake components with Mr. Sullivan, who performed the test. *See* Deposition of David McLellan in *Haag* matter, 51:5-19 (Exh "10" to Graifman Expert Decl.) ("McLellan *Haag* Dep."). Mr. McLellan then extrapolated facts and data from the corrosion testing and photographs of braking components in Class Vehicles and analyzed the facts and data using his specialized knowledge and experience to identify a materials defect in Class Vehicles.

Because HMA does not dispute that Mr. McLellan derived his "conclusions on reliable results from tests conducted by independent consultants and observed by representatives of numerous interested parties[,]" HMA's argument that Mr. McLellan's sources were not sufficient goes to the weight, rather than the relevance or admissibility, of his testimony. *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d, at 285. Mr. McLellan's independent analysis is far from the expert analysis offered in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) which Hyundai cites in support of its contention that Mr. McLellan's testimony is hearsay. In that case, two historians opined on conversations with artists who contracted with Marvel to conclude whether those particular artists

18

understood their agreements with Marvel Comics in a particular way. Their analysis consisted of repeating conversations and going beyond their areas of expertise to perform essentially psychological assessments of the artists' mental states. *Id*.

At p. 16-17 of its brief, HMA has the temerity to seek to question McLellan's ability to rely on the findings and analysis of HMA's own engineers who work in the HATCI division of Hyundai. First, it is inaccurate to refer to them as a mere "non-party." HATCI is affiliated with HMA as a division of HMC and serves as its research arm. Indeed in the recent case, *Little v. Kia Motors America, Inc*., the Court noted with approval that the expert there, Scott King, reached his conclusion by relying on defendant' technical analysis of the brake defect *including* HATCI-type documents.[9] HMA's only avenue to fight McLellan's use of Defendant's HATCI materials as support for his own findings, is for HMA to refute the obvious conclusion reached by its own engineers:

To the extent that HMA disagrees with Mr. McLellan's conclusions, it can attempt to discredit him through cross-examination. HMA has not shown that Mr. McLellan's conclusions are "wholly speculative or conjectural... to the extent [Hyundai] contends they are still based on unfounded assumptions, such contentions 'go to the weight, not the admissibility, of the

---

[9] "To reach this conclusion, King reviewed a standardized industry report; Quality Assurance Field Product Reports and District Parts and Service Manager Reports, drafted by defendant's mechanics and managers throughout the United States; *defendant's Technical Assistance Center Incident Reports;* Technical Service Bulletins; and defendant's warranty brake claims data." *Little v Kia Motors Am., Inc.*, 455 N.J. Super 411, 419, 190 A.3d 502, 506 (App. Div. 2018) (emphasis added); *See also*, *Samuel-Bassett v Kia Motors Am., Inc.,* 613 Pa. 371, 432-33, 34 A.3d 1, 37 (2011) (reliance by expert on same internal reports of Defendant's Technical Assistance Center to support opinion allowed).

testimony.'" *Great N. Ins. Co. v. Power Cooling, Inc.*, Case No. 06-CV-874, 2007 U.S. Dist. LEXIS

95912, at *34 (E.D.N.Y. Dec. 18, 2007) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18,

21 (2d Cir. 1996)). HMA's "mere disagreement" with Mr. McLellan's conclusions "is insufficient

to render [his] opinions inadmissible *ipsie dixit*." *Bd. Of Trs. Of the Aftra Ret. Fund*, 2011 U.S. Dist.

LEXIS 144382, at *44.

### ii. *Mr. McLellan Relies on Sufficient Facts and Data to Prove Plaintiff's Claim For Breach of Warranty.*

With regard to the scope of the defect, HMA takes issue with Mr. McLellan for not

identifying: (1) an industry standard for the length of time that the components should last; (2) an

alternative design or the brake system; and (3) how often HMA has to replace its components as

compared to other manufacturers. Defts. Br., pp. 6-7, 17. But this is not a case about a negligent

design. HMA's warranty covers the covered brake parts. HMA's 30(b)(6) witness, Greg Webster,

confirmed this. Webster Dep., 81, 97-98, 223, 226 (Exh. "2" to Reply Class Cert Motion) HMA's

own brake specification                                                                                 That is

standard enough. Plaintiffs Marshall and White have asserted a claim for breach of warranty due to

HMA's failure to repair a materials defect, and a claim accusing HMA of engaging in unfair and

deceptive trade practices by selling a vehicle with a known defect without informing purchasers.

None of HMA's arguments, therefore, bear on the relevance and reliability of Mr. McLellan's

testimony as it applies in this case, particularly at the class certification juncture. Here, the facts in

issue is whether common materials were used and whether a common materials defect existed in

Class Vehicles. Industry standards of materials and stamina of ideal brakes and what materials other

manufacturers use to produce their brake components or alternative brake designs Hyundai could

have used, here, do not bear on Plaintiff's claims for breach of warranty and unfair and deceptive

trade practices.

**II.    Mr. McLellan Reasonably Applies the Evidence and Scientific Principles or Methods to The Facts of This Case.**

Defendant unsuccessfully attempts to challenge the reliability of Mr. McLellan's testimony by questioning whether Mr. McLellan reasonably applied the information to the facts of the case to develop his opinions. He has.  More to the point, Mr. McLellan has reasonably applied his own measurements and observations of the corroded brake components, HMA's reports, and testing performed by HATCI and Mr. Sullivan to the instant case because he has not "unjustly extrapolated from an accepted premise to an unfounded conclusion" or failed to account for "obvious alternative explanations" for the problem at issue. *Northbrook NY, LLC*, 2012 U.S. Dist. LEXIS 134699, at \*11-12. Defendant efforts to discredit Mr. McLellan's testimony by ignoring the extensive research already conducted by experts following principles and standards established by Defendant all the while mischaracterizing Plaintiffs' breach of warranty and deceptive trade practices for one of negligent design. Because Defendant has failed to meet its burden in seeking the exclusion of Mr. McLellan's testimony, Defendant's motion should be denied.

### *A. Defendant Focuses its Opposition to Mr. McLellan on Inquiries Wholly Irrelevant to the Relevance of Mr. McLellan's Expert Testimony*

HMA's disingenuously attempts to distance itself from the results of its own independent testing. Defendant argues that Mr. McLellan has provided no "reliable standard" on which to base his expert determinations and wrongly asserts industry standards apply by reference to fragmental language from *Daubert* referencing the maintenance of standards controlling "expert's methodology." *See* Defts. Br., p. 19. Defendant's arguments miss the mark.

Even if Defendant's assertions that Mr. McLellan did not identify an industry standard were taken as true, it is largely irrelevant to the determination of whether "the reasoning or methodology underlying" Mr. McLellan's testimony is "scientifically valid." *Daubert*, 509 U.S. at 592. Out of the

21

breadth of considerations Justice Blackmun details in the opinion of *Daubert*, Defendant keys its focus on language that specifically applies to expert methodology that involves "particular scientific technique." *Id.* at 594. A review of the excerpted language from *Daubert* makes clear that the standard referred to in this passage relates only to the operation of the techniques used by the expert witness, not the standards applicable to the subject of the expert testimony. *Id.* ("Additionally, in the case of a particular scientific technique… the existence and maintenance of standards controlling the technique's operation…). Furthermore, the single case Defendant cites on this matter is readily distinguished. In *Zornberg v. CBH Props., Inc.*, the Second Appellate Division of the Supreme Court of New York affirmed the lower court's grant of summary judgment and did not affirm the exclusion of a report under a *Daubert* analysis, as Defendant alludes. 967 N.Y.S.2d 742, 743 (2d Dep't 2013). Furthermore, as detailed above, the testing Mr. McLellan relied upon applied Defendant's own industry standards to identify the corrosion defect.

Moreover, Defendant misstates Mr. McLellan's theory on the Sonata's materials defect by mischaracterizing his deposition testimony. Defendant's claim that Mr. McLellan relies on warranties as a benchmark for the brake components' lifetime is patently inaccurate. *See* Defts. Br. at p. 20. When prompted with the specific question of whether brakes should last as long as the warranty, Mr. McLellan specific response was that "[n]obody is saying that the brake pads are going to last five years and 60,000… miles." McLellan *Miller* Dep. at 90:14-22 Exh. "11," to Graifman Expert Decl. Mr. McLellan's theory of the defect is not tied to the length of a warranty period, as Defendant claims, but instead on the materials Defendant used in manufacturing the relevant brake components. Mr. McLellan then makes this point clear by stating that "the wear of a brake pad is not determined by time" and that it is also dependent on "driver behavior." *Id.* at 91:9-23. Mr. McLellan does not contradict his report because he never proffered the theory Defendants

here create. Because Defendant premises its discussion regarding Mr. McLellan's analysis of "other factors" on this non-existing length of warranty-based theory, the arguments presented there should similarly be rejected.[10]

In sum, none of HMA's arguments bear on the relevance and reliability of Mr. McLellan's testimony as it applies in this case. Mr. McLellan's testimony need only be relevant and reliable to the class certification issues at this stage, *e.g.* commonality. *See* Fed R. Evid. 702. As explained previously, the testing relied on rests on reliable foundations widely accepted. *See, generally,* I.A. Here, the facts at issue are whether a materials defect existed in Class Vehicles and whether HMA knew or should have known about the defect.

### *B. Mr. McLellan Reasonably Applies the Evidence to The Facts to Identify The Materials as The Cause of Premature Corrosion in Class Vehicles.*

Paradoxically, HMA also argues that Mr. McLellan identified a defect, but that he did not account for how various conditions would contribute to premature corrosion or lead to the need for brake repairs. Defts. Br., p. 21. Importantly, Mr. McLellan notes that Hyundai itself found

McLellan Report, p. 5 (referencing Apr. 2008 QIR). Mr. McLellan also does not need to account for the type, amount, or method of application of road salts

---

10 Even were the Court to find Defendant's discussion relevant, the cases Defendant cites are wholly distinguishable. In *In re Ford Motor Co. Vehicle Paint Litig.*, the Eastern District of Louisiana denied certification due to a lack of predominance because the expert's testimony indicated that no paint peeling would occur even when a paint primer was applied, the alleged defect. 182 F.R.D. 214, 220 (E.D. La. 1998). *In re Motor Co.* does not incorporate any *Daubert* analysis and is thus inapplicable to the present case. *Wills v. Amerada Hess Corp., 379 F. 3d 32, 50 (2d Civ. 2004)* the Court found that the expert had filed to account for "possible causes." *Id.* In the present case, Defendant has identified contributing factors that affect the timing, not the cause, of the corrosion defect. *Raskin v. Wyatt* does not control for this same reason as well as the added reason that the case relates to age discrimination and not materials defects.

in the Salt Belt States to validate his conclusions because he agrees that the salt conditions contribute to the corrosion, but that these are expected conditions that HMA should have designed components to withstand and cover under the warranty. *See* McLellan Report, p. 16 (citing Lynch Report, p.2); *see also* McLellan *Haag* Dep., 201:13-17 (Exh "10" to Graifman Expert Decl.) ("If you're going to sell cars in New York state, you need to meet the environmental requirements or the environmental situation as you find it, yeah. You're not going to change the environment, no. So the cars just have to meet that."). As Mr. McLellan expressed in his expert report:

> To the extent that Hyundai attempts to blame these failures on the environment or on the consumer, I find that such excuses are inappropriate because the conditions of snow, ice, or wet roads and use of salt for winter roads are common, normal, and expected conditions and brake parts, some of which (according to [Hyundai's] witnesses) are designed to last for the life of the vehicle or at least 184,000 miles, should at least be covered under the basic warranty, unless expressly excluded by that warranty.

McLellan Report, p. 16. HMA does not exclude ice, snow, salt, or other naturally occurring conditions from its warranty coverage. *See* Class Vehicles' Basic Warranty. This is likely, in part, due to the fact that cars are "inherently mobile[,]" so it would be difficult to design cars for particular states and not others. 2016 McLellan *Haag* Dep., 201:23-25.

As to the maintenance habits of HMA owners, Mr. McLellan opined in his deposition that washing the vehicle does not negate the importance of materials selection or the progression of corrosion already in the vehicle:

> Q: Do you agree that a variety of factors other than component materials and coatings affect the rate of corrosion of a component?
>
> A. Offhand, I can't think of what those additional attributes are because I think you cover it with the base material and its coatings.
>
> Q: Would the rate of corrosion be affected by whether the underside of a vehicle is regularly washed?

> A. I don't think that matters particularly. I mean what's the purpose of washing the
> bottom of the vehicle? Is it to get -- is it to remove poultice corrosion -- poultice,
> where you have clumps of gravel or sand or dirt that come up from the road and get
> into corners of a frame or a component system, and-- and then they hold moisture
> and you get continuous corrosion? Washing the bottom of the car in a car wash, you
> know, is that sufficient to eliminate these poultice buildups? I don't know that it is.
> And nobody gets under their car and washes it with a pressure washer that I know
> of...

McLellan *Haag* Dep.,107:1-21.

> ... [T]he portion that has to do with washing the underbody, once these -- once this
> corrosive liquid has found its way into these interfaces and has caused iron oxide to
> form, washing the car isn't going to do you a lot of good.

*Id.*, at 109:6-10. Ultimately, HMA's dispute as to contributing factors to the corrosion of the brake

components do not bear on the admissibility of Mr. McLellan's testimony, but the weight. *Figueroa*

*v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003) ("a failure to rule out alternative

causes is not determinative of admissibility of evidence but goes to weight, which is for a jury to

decide"); *accord Franz v. New Eng. Disposal Techs.*, Inc., Case No. 10-201, 2016 U.S. Dist. LEXIS

78734, at *14 (W.D.N.Y. June 16, 2016) ("failure to consider possible alternative causes... [is] a

fact question subject to cross-examination going to the weight of the [expert] opinion[.]").

### *C. Mr. McLellan's Theory Specifically Addresses the Material Issues of Plaintiffs' Claims.*

This is not a case where an expert applies a completely unrelated test to a case or does not

explain his rationale. Mr. McLellan has used his engineering expertise to put together a cohesive

theory that the Sonata vehicles suffer from a materials defect in the brakes based on the reports,

analysis and testing of the very components at issue or virtually identical components. *See*,

*generally*, I.A. Far from making unjust extrapolations, Mr. McLellan's knowledge of materials

selection choices defects in automotive parts and his application of corrosion tests performed on and

measurements taken of particular materials outside of the context of litigation to the instant case

establishes the reliability of his Report. *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (finding "legitimate, preexisting research unrelated to the litigation" reliable). Mr. McLellan also considers obvious alternative explanations of the corrosion, such as differences in the distribution of winter road salts or maintenance habits of Class Vehicle owners; however, he finds that neither weather nor maintenance supersedes the primary cause of the defect.

The relevant questions to the trier of fact are not what should occur in the absence of the defect identified by Mr. McLellan and Defendant's own independent testing, but instead, what causes the components to corrode to the point that they manifest these symptoms before the end of the Warranty or their useful life. If a material defect causes components to corrode to the point of failure which was known to HMA and purposefully concealed by applying the temporary "field fix" while charging consumers for repairs after repairs, such conduct is violative of GBL § 349. HMA argues that Mr. McLellan must calculate how often corrosion leads to the replacement of the brake component, but that is not the case for a breach of warranty claim. *See* Defts. Br., p. 23. Mr. McLellan clearly put forth, in both his report and deposition, exactly which components are defective and how the corrosion manifested in the brake systems of class vehicles.

Both Mr. McLellan and Intertek found that corrosion froze the brake pads into the frame, which prevented them from engaging the brake disk; moreover, both experts observed the development of rust on the brake disk. *See* McLellan Report, pp. 11-12. Furthermore, the exemplar caliper pistons and bores were frozen in place due to corrosion in the annular gap between the piston and bore and on the bore itself. *See* McLellan Report, pp. 9-11; *accord* Intertek Report, p. 7-10, 21, (Exh. "25" to Class Cert Motion). The testing demonstrated the intense degree of seizing in these brakes due to corrosion and were corroborated by the numerous complaints of seizing. Intertek Report, p. 8, A study of the piston and bore demonstrated that even a small amount of

26

corrosion would cause the parts to seize due to the small amount of clearance between the two. McLellan Report, pp. 10-12; Intertek Report, p. 9.

Ultimately, McLellan and Intertek concluded that corrosion was a result of a materials defect "since such parts should not corrode to the point of binding or freezing during the warranty[,]" McLellan Report, p. 9, and "the corrosion had occurred almost exclusively in the cast iron housing material," which includes the bore, the brake disks, and the rotors, but not on the outside of the chromium-plated piston. Intertek Report, p. 21. With respect to the HATCI report, McLellan testified as follows:



Q. Let me just stop you there. Do you have any reason to disagree with that conclusion? A. Not at all.

Q. As an engineer, do you believe that that conclusion is supported by the evidence there?

A. I think they supported it very well with their – the evidence from 22 different vehicles.

Q. As chief engineer of the Corvette, if you saw this type of evidence, what would you do? A. I'd be all over them. If it were my vehicle, yeah, you can't let this stuff linger.

McLellan *Haag* Dep. at 208:20-209:11.

Accordingly, Mr. McLellan has used his engineering expertise to put together a cohesive theory that the Sonata vehicles suffer from a materials defect in the brakes based on the reports, analysis and testing of the components at issue. His testimony should therefore be admissible.

### III. Mr. McLellan's Opinions Are Well Within His Area of Expertise

HMA contends that Mr. McLellan is not qualified to offer an opinion on whether the repairs at issue should have been covered under the Limited Warranty. According to HMA, Mr. McLellan does no more than "summarize[ ] the contents of the Limited Warranty" then "opine[ ] that the alleged defects should have been covered." Def. Br. at 25. But this is inaccurate. Mr. McLellan's opinion that the alleged defects should have been covered by the Limited Warranty is premised upon his opinion that the parts at issue are failing because they are "defective in material," McLellan Report at 16 (parts at issue prematurely corroding due to materials of the components), a prerequisite for warranty coverage. In other words, Mr. McLellan is not offering an opinion on "warranty issues," but rather an opinion on product defect. As discussed at length herein, Mr. McLellan is amply qualified to offer an opinion on whether a brake component is defective in material. Ironically, Defendant's only argument is that it covered many of the corrosion-induced seizures under warranty which completely dispels its unfounded argument that this is not a materials defect which is covered by the warranty. Its own conduct serves as an admission against interest in this regard.

## CONCLUSION

For the reasons wet forth herein, HMA's motion to exclude Plaintiffs' experts should be denied.

Dated: May 24, 2019

Respectfully submitted,

/s/ Gary S. Graifman
Gary S. Graifman, Esq.
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
Tel: (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com

28

Gary E. Mason, Esq.
**WHITFIELD, BRYSON
& MASON LLP**
5101 Wisconsin Avenue, NW
Suite 305
Washington, DC 20016
Tel: (202) 429-2290
gmason@wbmllp.com

Nicholas A. Migliaccio, Esq.
Jason S. Rathod, Esq.
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E.
Ste. 302
Washington, D.C. 20002
Tel: (202) 470-3520

Elmer Robert Keach, III, Esq.
**LAW OFFICES OF ELMER
ROBERT KEACH, III, P.C.**
One Pine West Plaza
Suite 109
Albany, NY 12205
Tel: (518) 434-1718
Fax: (518) 770-1558
bobkeach@keachlawfirm.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24th, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, to be served on all participants in the case who are registered CM/ECF users.

*/s/* Gary S. Graifman
Gary S. Graifman, Esq.